**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| H2I GROUP, INC., | |
| Plaintiff, | Civil No. 19-2870 (JRT/DTS) |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| SHAUN MILLER, BRIAN DURANT, and ALL SEASONS SPORTS, | |
| Defendants. | |

Martin D. Kappenman, and Gregory L. Peters, **PETERS, REVNEW, KAPPENMAN & ANDERSON, P.A.**, 7300 Metro Boulevard, Suite 500, Minneapolis, Minnesota 55439, for plaintiff.

David W. Reynolds, and Shelby K. Taylor, **DIAMOND MCCARTHY LLP**, 2711 North Haskell Avenue, Suite 3100, Dallas, Texas 75205, Juvian J. Hernandez, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, Minnesota 55402, for defendants.

H2I Group, Inc. ("H2I") brought this action against its former employee Shaun Miller ("Miller"), Brian Durant ("Durant"), and Durant's sole proprietorship, All Seasons Sports ("All Seasons"), alleging breach of Miller's noncompete agreement and several related business torts. H2I also moved for a preliminary injunction against all Defendants. Defendants moved to dismiss for lack of personal jurisdiction. The Court will grant the Motion to Dismiss as to Durant and All Seasons but deny the Motion as to Miller. The Court will also deny H2I's Motion for a Preliminary Injunction.

# BACKGROUND

I. **THE PARTIES**

H2I is a Minnesota corporation, with its principle place of business in Minneapolis. (Compl. ¶ 1, Nov. 11, 2019, Docket No. 1.) It was previously known as Haldeman-Homme, Inc ("Haldeman"). (*Id.* at 1.) H2I "specializes in . . . renovating gymnasiums, designing and constructing new gymnasium spaces and outfitting athletic facilities." (*Id.* ¶ 2.) H2I provides these services in, among other places, Arkansas, Oklahoma, and Texas. (First Decl. of Nicole Ferderer ("1st Ferderer Decl.") ¶ 2, Nov. 12, 2019, Docket No. 8.)

Miller was offered employment as a project engineer with Haldeman on October 6, 2014. (1st Ferderer Decl., Ex. A at 3.) He executed the offer letter ("Offer Letter") the following day. (*Id.*) The Offer Letter was on Haldeman letterhead with the address of its Texas office at the top. (*Id.*) It required, "as a condition of and consideration for acceptance of th[e] offer," that Miller sign a "Non-Compete and Non[-]Solicitation Agreement." (*Id.*) Miller signed a form Non-Solicitation and Non-Competition Agreement (the "Noncompete") on October 7, 2014. (1st Ferderer Decl., Ex. B at 4.)

Miller was promoted to project manager in June 2015. (Decl. of Shaun Miller ("Miller Decl.") ¶ 3, Dec. 6, 2019, Docket No. 36.) In October 2015, Miller was transferred from projects overseeing the construction of science labs to athletic-equipment projects. (*Id.* ¶ 4.) He oversaw projects "in the northern half of Texas" and also within "the entire states of Arkansas and Oklahoma." (First Decl. of Tracy Scheibel ("1st Scheibel Decl.") ¶ 4,

Ex. B at 4–11, Nov. 11, 2019, Docket No. 9.)  According to his supervisor, "Miller managed the profit, installation, contract, timeline, contract submittals, contract change orders, sales of additional equipment, and closeout documents . . . ."  (Second Decl. of Tracy Scheibel ("2nd Scheibel Decl.") ¶ 3, Dec. 6, 2019, Docket No. 33.)  Miller says that he "did not sell or have dealings with prospective clients," and that his role was limited to issuing purchase orders, submitting documents, working with clients and subcontractors to schedule installations, approving invoices, and "stating when the project was ready to be billed."  (Miller Decl. ¶ 10.)  He also describes his work as "the supervision of numerous subcontractors that were hired" to complete the athletic-equipment installations.  (*Id.* ¶ 12.)

Durant is the owner of OB1 Renovations ("OB1"), a company that "initially focused on house remodeling" but that in 2016 "transition[ed] into athletic installations." (Second Decl. of Brian Durant ("2nd Durant Decl.") ¶ 2, Dec. 6, 2019, Docket No. 37.)  Durant first met Miller through Durant's ex-wife, Elizabeth.  (*Id.* ¶ 5.)  Miller married Elizabeth in 2015. (Miller Decl. ¶ 20.)  Miller recruited Durant and OB1 to serve as a subcontractor for H2I beginning in 2016 and "[i]t quickly became clear that [OB1] was the most reliable and able installer" with whom Miller worked.  (*Id.* ¶ 21–22.)  Miller and Durant continued to work closely together and, because Durant "was a close family friend" with whom Miller "would socialize . . . outside of work," Miller would "help Durant coordinate his schedule to avoid delays" on the projects for which Durant served as a subcontractor.  (*Id.* ¶ 24.)

In late 2018, Durant decided to form All Seasons. (2nd Durant Decl. ¶¶ 11–12.) He did so after learning that Haldeman sales reps had failed to follow up on leads/referrals that Durant had passed along. (*Id.*) His intention in forming All Seasons was to bid for and perform on "the types of projects that [Haldeman] passed on." (*Id.* ¶ 12.) Its principle place of business is Dallas and its primary work is sports-equipment installation projects. (First Decl. of Brian Durant ("1st Durant Decl.") ¶ 5, Nov. 27, 2019, Docket No. 25.)

After Durant organized All Seasons, he was advised by Miller that Haldeman "would not have any issues so long as All Season[s] did not interfere with" Haldeman projects. (2nd Durant Decl. ¶ 13.) Miller's wife (and Durant's ex-wife), Elizabeth, handled administrative responsibilities for the new entity. (*Id.*) Miller also began to manage All Seasons' installation schedule. (*Id.* ¶ 14; Miller Decl. ¶ 26.) Miller did this without compensation, and Durant and Miller both assert that Miller managed the schedule to ensure "there would not be any shortages on" Haldeman projects. (2nd Durant Decl. ¶ 14; Miller Decl. ¶ 26.)

When Elizabeth became pregnant with twins in 2019, she became unable to continue handling administrative duties for All Seasons. (Miller Decl. ¶ 28.) Miller and Durant then decided that Miller would coordinate All Seasons installation schedule "even outside of projects [Miller] managed for Haldeman Homme" and would, therefore, "communicate with project leads" on those projects. (*Id.* ¶ 29.) Miller says this work

"allow[ed] Durant to focus on the installation aspect of All Season[s] Sports," which Miller claims "was not in competition with Haldeman Homme." (*Id.*)

After the birth of his twins, Miller began to feel that his work schedule at Haldeman Homme, in which 80-hour weeks were not uncommon, was incompatible with his responsibilities as a father. (*Id.* ¶ 40.) He asked his supervisor, Terry Scheibel, for assistance overseeing projects, but that request was denied. (*Id.* ¶ 41.) Miller then spoke with Durant and they decided that Miller would resign from Haldeman and work for All Seasons. (*Id.* ¶ 45.) Miller resigned from Haldeman on August 7, 2019 and his resignation became effective on August 15, 2019. (*Id.* ¶ 41.) Miller, at the time of his resignation, signed a Confidential Separation Agreement and Release ("Separation Agreement"). (1st Ferderer Decl., Ex. C at 5-8.) Miller states that he has worked for All Seasons since his resignation from Haldeman Homme, and receives a $1000-a-week salary. (*Id.* ¶ 46.)

## II. THE CONTRACTS

### A. The Noncompete

The Noncompete is limited in geographic scope to "a 150[-]mile radius of the main office (or territory field office, if [the signer] do[es] not regularly report to the main office." (1st Ferderer Decl., Ex. B at 4.) It is limited in duration to "twelve (12) months following the termination of [the signer's] employment (the 'Period'), whether involuntary or voluntary . . . without the prior written agreement of the President of the Company." (*Id.*)

Subject to those limitations, the signer agrees not to violate four promises:

> **PROMISE 1:** I promise, during the Period, not to solicit, sell to, consult or communicate with, or in any manner or form whatsoever, do business with any person of [sic] business entity, which was a customer or prospective customer of the Company, at any time within the three years prior to my termination;.
>
> **PROMISE 2:** I promise, during the Period, not to solicit for employment or employ, on my own behalf or that of any other person or business entity, any person who was an employee of the Company at any time within the twelve months prior to my termination;
>
> **PROMISE 3:** I promise, during the Period, not to solicit, buy from, represent, commit or communicate with, or in any manner or form whatsoever, do business with any person or business entity who was a vendor, dealer, manufacturer or supplier, prospective dealer, manufacturer or supplier, of the, Company at any time within the three years prior to my termination of employment; and
>
> **PROMISE 4:** I promise, during the Period, not to own, operate, consult for, do business with, contract with or be employed by, any person or business entity engaged in a business whose products and/or services are substantially similar to, or competitive with any products and/or services which were offered by the Company within the three years prior to the termination of my employment.

(*Id.*) The Noncompete was signed by Miller and Ronald Johnson, president of Haldeman. (*Id.*)

### B. The Separation Agreement

In exchange for signing the Separation Agreement, which waives and releases Haldeman from any claims Miller might have against it, Miller was given $2,615.20 in

severance pay. (1st Ferderer Decl., Ex. C at 5, ¶ 2.) In addition to a general waiver and release clause, the Separation Agreement also has a specific waiver and release for any Minnesota Human Rights Act claims. (*Id.* at 6–7, ¶ 4(c).) It also contains a choice-of-law provision that the "Agreement shall be governed in all respects by the laws of the State of Minnesota." (*Id.* at 8, ¶ 14.) Miller acknowledged that "he has access to confidential information of various kinds" and agreed that he would not "disclose or cause or permit to be disclosed any such information . . . to any person, firm, corporation, association or other entity for any reason or purpose." (*Id.* at 7–8, ¶ 11.)

### III.    THE CLAIMS

After Miller's resignation, H2I became aware that he had begun to work with Durant at All Seasons. (Compl. ¶¶ 25–30.) H2I also saw photos of its completed projects on All Seasons' website under headings of "Our Services" and "Our Work – Project Possibilities." (Compl. ¶¶ 31–34.) H2I then brought this action, alleging breach of contract claims, tortious interference claims, unjust enrichment, and breach of the duty of loyalty. (Compl. ¶¶ 42–74.) After filing the case, H2I moved for a preliminary injunction. (Pl.'s Mot. for Prelim. Inj., Nov. 12, 2019, Docket No. 5.) Defendants moved to dismiss for lack of personal jurisdiction. (Mot. to Dismiss, Nov. 27, 2019, Docket No. 22.)

## DISCUSSION

### I.    PERSONAL JURISDICTION

Federal Rule of Civil Procedure 12(b)(2) allows parties to seek dismissal of claims for lack of personal jurisdiction. The party seeking to establish personal jurisdiction bears the burden of proof, and "the burden does not shift to the party challenging jurisdiction." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003). "To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." *Id.* To make its prima facie showing, the Court must view the evidence in the light most favorable to the nonmoving party. *Westley v. Mann*, 896 F. Supp. 2d 775, 786 (D. Minn. 2012).

The Court may exercise personal jurisdiction over a defendant if doing so (1) is consistent with the Minnesota's long-arm statute, Minn. Stat. § 543.19; and (2) comports with the Due Process Clause. *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1014–15 (D. Minn. 2008). Because Minnesota's long-arm statue extends as far as the Constitution allows, the inquiry collapses into one step and the Court need only consider whether exercising personal jurisdiction over Defendants is consistent with the Due Process Clause. *Id.* at 1015.

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). "The touchstone of the due-process analysis remains whether the defendant has sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial

justice." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 594 (8th Cir. 2011) (cleaned up). "The central question is whether a defendant has purposefully availed itself of the privilege of conducting activities in the forum state and should, therefore, reasonably anticipate being haled into court there." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003).

While personal jurisdiction can be general or specific, this case concerns only whether Defendants have sufficient minimum contacts to support specific jurisdiction. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283–84. The complained-of conduct "must arise out of contacts that defendant" creates with the forum state. *Id.* at 284. "The plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. Rather, it is the defendants' conduct that must form the necessary connection with the forum for the Court to exercise jurisdiction over them.

The Eighth Circuit has promulgated a five-factor test to determine whether a court may exercise specific personal jurisdiction over defendants:

(1) the nature and quality of the contacts with the forum state;
(2) the quantity of the contacts with the forum state;
(3) the relation of the cause of action to the contacts;
(4) the interest of the forum state in providing a forum for its residents; and
(5) the convenience of the parties.

*Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 922 (8th Cir. 1995). "[T]he first two factors go primarily to whether minimum contacts exist," the third determines whether the action arises from the contacts, and "the last two examine reasonableness." *Yellow Brick Road, LLC, v. Childs*, 36 F. Supp. 3d 855, 864 (D. Minn. 2014).

A. **Shaun Miller**

H2I appears to argue that Miller's minimum contacts arise from the two contracts that it asserts Miller has breached: the Noncompete and the Separation Agreement.[1] "A contract with a citizen of a State alone is insufficient to establish minimum contacts with that forum." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 980 (8th Cir. 2015) (cleaned up). However, "when the prior negotiations of the contract, the subject and purpose of the contract, and the parties' actual course of dealing all implicate the forum state, these surrounding circumstances may be sufficient minimum contacts" to exercise specific personal jurisdiction. *CHS Inc. v. Farmers Propane Inc.*, No. 18-CV-1422 (WMW/ECW), 2019 WL 3886837, at *3 (D. Minn. Aug. 19, 2019) (cleaned up).

According to the terms of the letter offering Miller employment, signing the Noncompete was a condition of accepting the job. Such terms suggest limited prior negotiations. However, the subject and purpose of the Noncompete was to ensure that

---

[1] H2I argues extensively that the mere fact Miller was employed by a Minnesota company is sufficient to provide minimum contacts. However, Miller's employment was at-will and the offer letter he signed in 2014 therefore cannot be analyzed as an employment contract for personal jurisdiction purposes.

H2I, a Minnesota corporation, would not be harmed by a former employee. Therefore, the subject and purpose of the contract arguably implicate Minnesota, although the negotiation (limited as it appears to have been) may not.

In addition, although the Separation Agreement does not contain a forum-selection clause, it does contain a choice-of-law provision applying Minnesota law. Although a choice-of-law provision, "standing alone would be insufficient to confer jurisdiction," its inclusion, in combination with a long relationship between a defendant and the forum, may reinforce a "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482, (1985). Here, the choice-of-law provision comes at the end of a five-year employment relationship between Miller and H2I and may well be indicative of a reasonable expectation that any litigation between Miller and H2I would take place in Minnesota.

The facts in this case are not as dispositive as in *ProMove, Inc. v. Siepman*, 355 F. Supp. 3d 816 (D. Minn. 2019). In that case, out-of-state defendants executed a letter of intent containing both a Minnesota forum-selection and choice-of-law provision at the beginning of their employment with a Minnesota company. *Id.* at 821. That fact, in combination with the length of time the defendants had been employees of a Minnesota company and the Minnesota-directed activities they took as part of their employment, led the Court to conclude jurisdiction was proper. *Id.* at 822. Although something like

the letter of intent is missing here, the combination of the subject and purpose of the Noncompete; the Minnesota orientation of the Separation Agreement; the five-year employment relationship between Miller and a Minnesota company; and the Minnesota-directed actions taken by Miller as part of his employment—described in the declaration of his direct supervisor, Tracy Scheibel—leads the Court to conclude that Miller has sufficient minimum contacts with Minnesota to give rise to specific personal jurisdiction in this case. *Cf. Siepman*, 355 F. Supp. 3d at 821–22. Therefore, the Court will deny Defendants' Motion to Dismiss as to Miller.

### B. Brian Durant and All Seasons

Plaintiff does not allege any contractual basis for personal jurisdiction with either Durant or All Seasons. Instead, it relies on the "effects test" articulated in *Calder v. Jones*, 465 U.S. 783 (1984), which applies when the effects of an intentional tort are felt in a particular forum. H2I argues that Durant and All Seasons tortiously interfered with its contracts and its prospective economic advantage.

In *Calder*, the Supreme Court upheld the exercise, by a California court, of personal jurisdiction over the Florida-based "editor and reporter of the *National Enquirer*, a Florida-based newspaper with a nationwide circulation." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390 (8th Cir. 1991). Plaintiff, a California resident, had sued for libel, and the Supreme Court concluded that because the editor and reporter (1) had acted intentionally, (2) knew that a particular plaintiff would be harmed, and (3) that

"they knew that the brunt of injury would be suffered in the state where the plaintiff lived," that jurisdiction was appropriate. *Id.* This, the Court said, was because, "under these circumstances, petitioners must reasonably anticipate being haled into court" in California. *Id.* (quoting *Calder*, 465 U.S. at 790).

As the Court has previously acknowledged, the "key allegation of an intentional tort takes the contacts analysis beyond the traditional factors to the additional considerations mandated by *Calder*." *Raymedica, Inc. v. Stoy*, No. Civ 01-1841(JRT/FLN), 2002 WL 31185916, at *4 (D. Minn. Sept. 30, 2002). However, in *Stoy*, the defendants' knowledge of the contracts which plaintiff alleged he had violated was unquestioned. Likewise, in *Dakota Industries, Inc.*, there was evidence that defendant had twice attempted to register the allegedly infringing trademark and been rejected. 946 F.2d at 1386. In this case, however, there is no showing of intent. Here, both Miller and Durant assert they had never discussed the Noncompete. H2I does nothing more than allege that Durant must have known Miller would be subject to such an agreement because they are common in the construction industry. Without such a showing of intent, H2I has failed to show an intentional tort aimed at Minnesota and therefore cannot rely on *Calder*.

H2I also focuses significant attention on the use of its former marketing and IT intern, Cody Abel ("Abel"), to design the website for All Seasons.[2] (*See, e.g.*, 2nd Decl. of Nicole Ferderer ("2nd Ferderer Decl.") ¶ 3, Ex. 1, Dec. 6, 2019, Docket No. 32.) However, as Ferderer notes, Abel's internship with H2I had ended in May 2019. (*Id.*) The emails produced by Defendants show Abel working on the website months later, in the fall of 2019, after his internship was over. (2nd Decl. of Martin Kappenman ("2nd Kappenman Decl."), Ex. 1, Dec. 6, 2019, Docket No. 34.) The emails do make clear, though, that Abel, a Minnesota resident, was paid by All Seasons for his work on the website. (*Id.*) Although this may be evidence of Minnesota-directed activities for the purpose of a general inquiry into whether personal jurisdiction exists, it does not speak to the intentional-tort analysis needed for *Calder*.

Application of the effects test for which H2I argues stretches *Calder* too far. There is no evidence that Durant knew of the Noncompete, let alone sufficient evidence to show Durant knew that he was committing a tort and "knew that the brunt of injury" would be felt in Minnesota. Additionally, Durant has never travelled to Minnesota in connection

---

[2] H2I initially claimed the website was designed by a former H2I information technology employee, Ian Anderson. (Decl. of Jeff Maloney ("Maloney Decl.") ¶ 9, Nov. 12, 2019, Docket No. 10.) However, Anderson filed a declaration in which he asserts he "never created any website for Shaun Miller." (Decl. of Ian Anderson ("Anderson Decl.") ¶ 5, Nov. 27, 2019, Docket No. 26.) H2I then stated in its Reply, based on emails provided by Defendants during discovery, that it was Abel who designed the website. (2nd Ferderer Decl. ¶ 3, Ex. 1.)

with his subcontractor relationship with H2I, and All Seasons has never done work as a subcontractor with H2I in Minnesota. Because H2I fails to demonstrate sufficient minimum contacts, even under the more flexible *Calder* standard, the Court will grant Defendants' Motion to Dismiss as to Durant and All Seasons.

II. **PRELIMINARY INJUNCTION**

H2I has also filed a Motion for a Preliminary Injunction against Miller. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24 (2008). The Court considers four factors in determining whether to grant preliminary injunctive relief: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* The party requesting injunctive relief bears the complete burden for showing the above factors. *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).

A. **Irreparable Harm**

To obtain a preliminary injunction, a plaintiff must show not only that irreparable harm is possible but that it is "*likely* in the absence of an injunction." *Winter,* 555 U.S. at

22 (emphasis in the original). The lack of irreparable harm, on its own, is sufficient grounds on which to deny a preliminary injunction. *See Lewis*, 346 F.3d at 844 (citing *Adam–Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir. 1996)).

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "A former employee's breach of a restrictive covenant does not necessarily entail irreparable harm." *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 934 (D. Minn. 2016) (quoting *Timm & Assocs., Inc. v. Broad*, Case No. 05-2370, 2005 WL 2241832, at *3 (D. Minn. Nov. 30, 2005)). The moving party must still "show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir 1996).

H2I fails to show irreparable harm. Much of its work appears to be won based on a competitive bid process, yet H2I does not allege that Miller has any proprietary or specialized knowledge that would allow him to irreparably harm H2I's ability to bid for work. Nor does H2I allege the kind of conversion of customer goodwill or specific misappropriation of confidential information on Miller's part that would constitute irreparable harm. *Ernst*, 182 F. Supp 3d at 934–35; *cf. Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1054-57 (D. Minn. 2019).

Because it appears that money damages would sufficiently compensate any harm experienced by H2I if it were to prevail on any of its claims against Miller, the Court will not grant the extraordinary remedy of issuing an injunction.

### B. Likelihood of Success on the Merits

Even if H2I had not failed to show irreparable harm, the Court still would not grant the injunction because H2I has not at this stage demonstrated likelihood of success on the merits.

#### 1. Breach of the Noncompete

Whether H2I can succeed on the merits of this claim is unclear because of the volume of disputed facts. Miller says that H2I never considered the renovation business to be competitive, given that its business is primarily new builds. H2I disagrees and argues that what Miller is doing through All Seasons includes new-build work, citing language from All Seasons' website to that effect. Although the four promises in the Noncompete are very broad, and Miller admits that at least some of the work he has done with New Seasons took place within the 150-mile radius of the H2I field office in Texas, it remains to be seen whether renovation work represents competition against H2I.

#### 2. Breach of the Separation Agreement

H2I provided no concrete evidence that Miller is making use of confidential information in his role at All Season—regarding customer information or some sort of specialized process to successfully bid on projects—and at the hearing, counsel confirmed

that H2I has no evidence of such activity at this time. Mere assertion of assumed harm is insufficient to succeed on this claim.

### 3. Tortious Interference

H2I included Miller in both its claims of tortious interference with contract and tortious interference with prospective economic advantage. However, he cannot have **interfered** with his own Noncompete and Separation Agreement—if he violated the terms of either, it would simply be breach.

As for the second claim, the Minnesota Supreme Court has laid out a five-factor test: (1) the existence of a reasonable expectation of economic advantage; (2) defendant's knowledge of that expectation; (3) defendant's intentional interference **and** the interference is either (a) independently tortious or (b) in violation of a law or regulation; (4) that in the absence of the defendant's wrongful interference, it is reasonably probable that plaintiff realizes the economic advantage; and (5) damages. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

H2I does not adequately explain what expectations of economic advantage it has in a business largely driven by competitive bidding; for example, it fails to allege whether the projects it lists as having lost because of Miller were bid-based or contract-based projects. *Cf. Gieseke*, 844 N.W.2d at 220–21 (noting that in assessing whether a plaintiff has a reasonable expectation of economic advantage, the burden is on the plaintiff to

"identify **specific** third parties with whom the plaintiff claims prospective economic relationships" in order to ensure the expectations are reasonable (emphasis added)). It also fails to allege any facts showing that, even if Miller intentionally interfered, such interference was independently tortious—that is, for example, that Miller induced parties with whom H2I had contracted to breach in favor of working with him and All Seasons.

####    4.      Other Claims

The two other claims in the complaint, unjust enrichment and breach of the duty of loyalty, are sparsely briefed. However, neither is a prospective harm and therefore they cannot serve as the basis for a preliminary injunction. *Cf. Iowa Utils. Bd.*, 109 F.3d at 425.

### CONCLUSION

Plaintiff has shown sufficient minimum contacts with Minnesota to give rise to specific personal jurisdiction over Miller but fails to do so for Durant or All Seasons. Plaintiff also fails to meet the high standard of showing that it will suffer irreparable harm without the issuance of an injunction.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [Docket No. 22] is **GRANTED in part and DENIED in part as described herein**;

2. Plaintiff's Motion for a Preliminary Injunction [Docket No. 5] is **DENIED**.

DATED: February 10, 2020 _____/s/ John R. Tunheim_____
at Minneapolis, Minnesota. JOHN R. TUNHEIM
Chief Judge
United States District Court